IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

ROBERTA JEAN IRIZARRY,

              Plaintiff,

     v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

ORDER

10-cv-606-wmc

_____

Pursuant to 42 U.S.C. §405(g), Roberta J. Irizarry seeks reversal of the Commissioner of Social Security's decision to deny Irizarry's application for Disability Insurance Benefits and Supplemental Security Income and has filed a motion for summary judgment. Irizarry contends that the administrative law judge did not adequately consider medical evidence of the frequency and debilitating nature of her migraine headaches. Additionally, Irizarry argues the administrative law judge did not properly determine her mental residual functional capacity. Finally, Irizarry argues that the administrative law judge erroneously discredited Irizarry's statements regarding the limiting effects of her impairments and failed to consider supporting evidence of her credibility.

On this record, the court concludes that the administrative law judge erred by not considering medical evidence in relation to Irizarry's migraine headaches. Also, the administrative law judge failed to provide adequate reasoning for discrediting the opinion

1

of the consultative examiner in her finding that Irizarry had only mild limitations in concentration, persistence and pace.  Finally, because remand is required on these two issues, the court will leave for further consideration by the administrative law judge additional evidence of credibility offered by plaintiff.

## FACTS[1]

### A. Background and Procedural History

Roberta J. Irizarry was born on June 10, 1965 and was 44 years old at the time of the hearing.  AR 9.  Irizarry is 5 feet 6 inches tall and is considered clinically obese at 228 pounds.  AR 526.  Irizarry completed up to the 11th grade of high school, but did not graduate.  AR 9.  Irizarry has worked as a housekeeper at a motel (heavy, unskilled), and as a cashier at Wal-Mart (light, unskilled).   AR 25-6.

Irizarry filed an application for disability insurance benefits on July 25, 2008.   AR 131.  In her application, Irizarry claims that she has been unable to work since February 20, 2008, because of lower back pain and migraine headaches.  AR 21.   After the local disability agency denied Irizarry's application initially and upon reconsideration, she requested a hearing which was held September 11, 2009, via video before administrative law judge Sharon Turner. The judge heard testimony from Irizarry, AR 7-18, medical expert Samuel Landau, AR 18-24, and vocational expert Kelly Winn.  AR 24-27.  At the hearing, Irizarry amended her onset date to June 28, 2008.  AR 10.

---

1   The following facts are drawn from the administrative record (AR).

On November 6, 2009, the Administrative Law Judge issued her decision denying disability insurance benefits to Irizarry.   AR 35.   The Appeals Council denied review of the Administrative Law Judge's decision.   AR 1.   That decision became the final decision of the Commissioner on September 28, 2010.   AR 5.

### B. Medical Evidence

Irizarry was involved in a car accident in December 2002 and suffered a T12 compression fracture in her mid-back.   AR 358.   Since the accident, Irizarry has complained of lower back pain and migraine headaches.   Irizarry has been prescribed several medications, attempted physical therapy and received facet joint injections to treat her chronic lower back pain and migraine headaches.

#### 1. Chronic Back Pain

On May 1, 2006, an x-ray of Irizarry's spine showed an abnormality at the T11-12 region, as well as a minimal degree of spondylolisthesis[2] at L5-S1.   AR 381.   On June 25, 2007, Irizarry visited Dr. Patterson's office at the Marshfield Clinic-Wausau Center complaining of back pain in her mid to low back.   AR 365.   The attending physician noted that Irizarry "experiences discomfort with palpation over the spinous processes as well as the paraspinal muscles in the thoracic as well as lumbar region."   AR 365.

---

2   *Spondylolisthesis* is defined as the "forward displacement of a lumbar vertebra on the one below it and especially of the fifth lumbar vertebra on the sacrum producing pain by compression of nerve roots." *Merriam-Webster's Medical Dictionary*.   Retrieved June 28, 2011, from Dictionary.com website:

Additionally, the doctor noted Irizarry was able to perform a deep knee bend without problems and was able to heel-toe walk without difficulty.   AR 365.   Dr. Patterson prescribed Vicodin and, if the pain persisted, she recommended physical therapy and pain clinic assessment.   AR 366.

On July 31, 2007, Irizarry reported to physical therapy.   AR 388.   The therapist noted that Irizarry had had some physical therapy in the past.   The therapist also noted that Irizarry worked as a cashier and, although she stood on a shock mat at work, Irizarry reported her pain symptoms increased the longer she stood at work.   AR 388.   At another physical therapy appointment on August 6, Irizarry was given an exercise regimen to follow at home and was recommended to attend physical therapy once per week.   AR 387.   A week later, the therapist noted that Irizarry was not following the prescribed home program and a "lack of cooperation with [the] home program will continue to irritate [Irizarry's] upper as well as lower quarter symptoms."   AR 386.   At this point, Irizarry discontinued physical therapy.

On October 15, 2007, Dr. Patterson refilled Irizarry's prescription of Vicodin, which was to last her a month.   AR 341.   Five days later, Irizarry went to the emergency room at Aspirus Wausau Hospital complaining "my back is just killing me."   AR 287. The supervising doctor noted that the X-ray examination of Irizarry's lumbar spine revealed "compression deformity of the vertebral body of T12, which is probably remote. The heights of the lumbar vertebral bodies are noted to be normal.   Disc space is

---

http://dictionary.reference.com/browse/spondylolisthesis

unremarkable. No spondylolysis or spondylolisthesis...." AR 291. Additionally, the doctor noted that Irizarry told conflicting stories regarding her use of Vicodin. She told a physician's assistant she only had six pills left and told the doctor she only used Vicodin at night and had not done so for the last three days. AR 287. A negative urine toxicology test confirmed that she was not taking Vicodin. Irizarry was encouraged to use the Vicodin and was referred to her regular physician for follow up. AR 289.

On November 26, 2007, Irizarry visited the pain clinic at Aspirus Wausau Hospital. AR 279. Dr. Ellias noted that an MRI scan showed "some L5-S1 spondylolisthesis and ... also a compression fracture to the thoracolumbar spine, mostly to the T12." AR 280. Upon physical examination, Dr. Ellias noted that "Waddell's testing was positive for 3/5 for pain behavior."[3] AR 280. The straight leg test with distraction was negative and without distraction was positive. Additionally, Dr. Ellias's impression

---

3

      Waddell et al in 1980 developed a standardized assessment of behavioral responses to examination. The signs were associated with other clinical measures of illness behavior and distress, and are not simply a feature of medicolegal presentations. Despite clear caveats about the interpretation of the signs, they have been misinterpreted and misused both clinically and medico-legally. Behavioral responses to examination provide useful clinical information, but need to be interpreted with care and understanding. Isolated signs should not be overinterpreted. Multiple signs suggest that the patient does not have a straightforward physical problem, but that psychological factors also need to be considered. Some patients may require both physical management of their physical pathology and more careful management of the psychosocial and behavioral aspects of their illness. Behavioral signs should be understood as responses affected by fear in the context of recovery from injury and the development of chronic incapacity. They offer only a psychological "yellow-flag" and not a complete psychological assessment. Behavioral signs are not on their own a test of credibility or faking.

Jon L. Gelman & Myron E. Brazin, *The Use of Waddell Tests in Workers Compensation Claims* [electronic version at http://www.chiro.org/LINKS/FULL/Wadell_Tests.shtml (visited, July 7, 2011)] *See also, Behavioral Responses to Examination: A Reappraisal of the Interpretation of "Nonorganic Signs"*, Main and Waddell, *Spine*, vol. 23, Nov. 1, 1998, pp. 2367-71.

included "a possibility of aberrant drug behavior," because Irizarry's urine test again came back negative "despite the fact that she told [Dr. Ellias] she [was] taking Hydrocodone." AR 280.   In his notes, Dr. Ellias cautioned prescribing opiates for Irizarry in light of the positive Waddell signs and pain behavior.   Dr. Ellias recommended facet joint injections and possible radio frequency ablation for pain relief of Irizarry's lower back.

On June 2, 2008, Irizarry received her first facet joint injection from Dr. Ellias. Ellias reported that Irizarry's pain before the injection was 6-7/10 and after the injection was reduced to 2.   AR 278.   On September 2, 2008, when Irizarry saw Ellias for follow up, the doctor reported that the previous facet joint injection "ha[d] really helped with the pain for about 80% for three to four weeks.   Even when the pain came back, it was not as bad."   AR 275.   Dr. Ellias repeated a facet joint injection that same day.   AR 275.

On September 11, 2008, Irizarry reported to the walk-in clinic at Langlade Hospital complaining of back pain.   AR 412.   The doctor noted upon examination of Irizarry's lumbar spine that she experienced "tenderness to palpation in the area of the sacroiliac joints bilaterally, as well as the lumbar paraspinals."   AR 412.   Irizarry asserted she had received facet joint injections, which had been helping with the pain, but this time, they did not help.   She was given Toradol and "did receive some pain relief" before being discharged.   AR 412.

In November 2008, Dr. Ellias performed radio frequency ablation because Irizarry "ha[d] responded well to the facet joint injection".   AR 427.   In March 2009, Irizarry saw Dr. Leek, a pain specialist at Langlade Hospital in Antigo.   Dr. Leek found Irizarry

had "[b]ilateral L5-S1 pars defect with multilevel bilateral lumbosacral facet joint dysfunction." AR 588. Dr. Leek prescribed a cane "for stability, since she has a history of multiple falls." He also recommended further physical therapy and joint injections. AR 588. Irizarry received joint injections from Dr. Leek with unchanged symptoms since the March 2009 exam on April 16, May 7, and July 16, 2009. AR 565, 523, 560.

2. Migraine Headaches

On her June 25, 2007, visit to Dr. Patterson's office, Irizarry complained of recurring headaches two to three times per week because her insurance had lapsed and she was unable to obtain prescription medication to prevent the headaches. AR 365. Irizarry mentioned that ibuprofen "helps enough that it takes the edge off that she can function and tolerate the headaches." AR 365. The attending physician noted that Irizarry previously had taken Amitriptyline "prior to bed with some success" and previously had been prescribed Maxalt, which "did give [Irizarry] full relief of the headaches." AR 365. Irizarry was given a prescription for amitriptyline and Imitrex instead of Maxalt, because her insurance did not cover Maxalt. AR 365. After taking the Imitrex, Irizarry experienced chest discomfort and discontinued its use. AR 357. In July and August 2007, Dr. Patterson gave Irizarry free samples of Maxalt, a prescription for amitriptyline, and a prescription for Zomig. AR 352, 361. After use of the Zomig, Irizarry again experienced chest discomfort and discontinued its use as well. AR 349.

In August 2007, Irizarry saw Dr. Patterson for follow-up and again was given free

samples of Maxalt.   AR 352.   Dr. Patterson was not able to get Maxalt approved by Irizarry's insurance.   AR 352.   On November 19, 2007, Irizarry called to request more free Maxalt samples because she was getting a headache every other day.   AR 330.   The samples were left for Irizarry to pick up at the clinic; however, Irizarry never did so.   AR 328.

Six months later, in May 2008, Irizarry returned to Dr. Patterson for a Well Woman exam because her BadgerCare had been reinstated.   AR 320.   Dr. Patterson noted Irizarry continued to have chronic headaches and that amitriptyline had helped to reduce them and directed Irizarry to use it.   AR 321.

On August 1, 2008, Irizarry called Dr. Patterson's office to complain that she was getting headaches almost daily, despite using Maxalt five times per week and taking amitriptyline.   Irizarry was advised to speak to Dr. Ellias about the increased frequency of the headaches and pain management options.   AR 310.   Three days later, Irizarry went to the emergency room at Langlade Hospital complaining of a migraine headache with some nausea and photosensitivity.   Irizarry also ranked her pain a 10 on a scale of 0 to 10.   The attending physician noted that Irizarry was not getting adequate relief from Maxalt; Irizarry stated that sometimes the Maxalt worked to relieve her symptoms and other times it did not.   By the time Irizarry was discharged from the emergency room, "[s]he was getting fairly good relief" from Morphine and Phenergan.   AR 404.

On August 28, 2008, Irizarry saw Dr. Moermond at the Langlade General Clinic and reported that she was getting three migraines per week.   Dr. Moermond gave her a

prescription for propranolol, and stressed that propranolol must be taken consistently to build up enough in her system to prevent migraines.   Moermond also referred Irizarry to neurologist Dr. Szmanda for further workup.   AR 425.

On Sept 25, 2008, Irizarry saw Dr. Szmanda to report her headaches were daily until she started propranolol.   Now the headaches were only every other day, but seemed more severe.  AR 409.   Dr. Szmanda also noted that Irizarry was alert and oriented and Irizarry's "[m]emory, insight and judgment appeared to be normal."   Also, he indicated Irizarry had an excellent fund of general knowledge.   AR 410.   Dr. Szmanda agreed with Dr. Moermond's prior diagnosis that propranolol was an excellent choice to help prevent Irizarry's migraines and increased the dose to 80 mgs.   AR 410.

Five days later, Irizarry reported to the emergency room with a severe migraine headache.   Irizarry told the attending physician that she had run out of Maxalt the day before the visit.   The physician noted that the headache was severe and that Irizarry had nausea and photophobia.   Irizarry was treated with Imitrex and Phenergan with some relief.  AR 407.

By October 30, 2008, Irizarry reported to Dr. Szmanda that her headaches, while still two to three times per week, were "not as severe."   Additionally, Irizarry confirmed that she did not have adverse side effects from the propranolol previously experienced with Imitrex and Zomig.   AR 518.

Irizarry next reported to the emergency room on January 25, 2009, complaining of a migraine.   She tried extra strength Tylenol and Maxalt without relief prior to the visit,

and was given Morphine and Phenergan before being discharged.  AR 508.  At a follow up visit in February 2009, the attending physician noted that Irizarry's headaches were less frequent since she started taking propranolol.  AR 482.

In April 2009, Irizarry again visited the emergency room for a migraine headache after Maxalt failed provide relief.  She was then given "Morphine and Phenergan with improvement."  AR 509.

On September 14, 2009, Irizarry told her neurologist, Dr. Szmanda, that she "stopped taking her propranolol last year and her headaches have consistently got worse and worse."  AR 584.  Dr. Szmanda re-prescribed an increased dosage of propranolol. AR 584.

Two weeks later, on September 28, Irizarry reported to the emergency room with another migraine headache and told the attending physician that she was unaware of an increased dosage prescription for propranolol from Dr. Szmanda.  AR 582.  The physician treated her with Dilaudid and told her to follow up with Dr. Moermond or Dr. Szmanda to obtain a "pain contract."  AR 582.


3.  Consultative Examination

Dennis Elmergreen, a doctor of psychology, met with Irizarry and completed a consultative disability report on December 28, 2008.  AR 431-33.  Elmergreen concluded that based on Irizarry's performance on several math and general information questions, her intellectual functioning was "well below average."  AR 432.  Additionally,

Elmergreen diagnosed Irizarry with generalized depression due to Irizarry's poor health and lack of money.  AR 433.  Elmergreen found that Irizarry had an "average degree of social skills."  AR 432. Elmergreen gave Irizarry a Global Assessment of Functioning Score of 60, which indicates a moderate difficulty in social, occupational or school functioning.  AR 433.  He found Irizarry was capable of handling funds dispersed to her even though her math skills were very poor.  AR 433.  During his consultation, Irizarry mentioned that on an average day, she spent her time watching TV, cooking, cleaning and attending appointments.  AR 432.  Elmergreen ultimately recommended further testing to rule out significant cognitive limitations contributing to a possible disability.   AR 433.

4.   Findings of State Agency Physicians

In January, 2009, State Agency Physicians Roger Rattan, Ph. D. and Mina Khotshidi, M.D., reviewed all evidence in the record.  AR 435-60.  Rattan completed a Psychiatric Review Technique (PRT) and Mental Residual Functional Capacity Assessment of Irizarry (―RFC).   AR 457-60.   Dr. Khotshidi completed a Physical Residual Functional Capacity Assessment (P-RFC).   AR 435-42.

Rattan confirmed Elmergreen's finding that Irizarry suffered from generalized depression due to her poor health.  AR 446.  As a result of the depression, he noted that Irizarry suffered mild limitation in daily activities and social functioning and experienced a moderate limitation in maintaining concentration, persistence and pace.  Specifically, in his M-RFC, Rattan concluded that on an ongoing basis over a normal workday and

workweek, Irizarry is moderately limited in carrying out detailed instructions and maintaining attention and concentration for extended periods.   AR 457.

Additionally, Rattan found Irizarry moderately limited in completing a normal workday and workweek without interruptions from her psychologically-based symptoms. AR 458. Rattan's findings revealed that Irizarry is moderately limited in performing at a consistent pace without an unreasonable number and length of rest periods, AR 458, although he found no significant limitations in the areas of understanding and memory or social interaction.   AR 457-8.   In June 2009, State Agency Reviewer Michael Mandli, Ph.D., affirmed the findings of Rattan's assessments.   AR 551.

Dr. Khotshidi, in her physical assessment of Irizarry, found that she could frequently lift or carry ten pounds and occasionally was able to lift up to twenty pounds. AR 436. The P-RFC reflected that Irizarry was able to stand, walk or sit with normal breaks for six hours of a normal eight-hour workday.   AR 436.   Additionally, Dr. Khorshidi recommended Irizarry avoid concentrated exposure to noise.   AR 439.   Dr. Khorshidi noted that Irizarry was having three migraines per week, but was able to sit for three hours, stand for a half hour, and walk for a half hour.   AR 442.   In June 2009, State Agency Reviewer, Pat Chan, M.D. affirmed Dr. Khorshidi's findings.   AR 550.

## C. Hearing Testimony

### 1. Irizarry's Testimony

At the Administrative Hearing in September 2009, Irizarry testified as follows.

12

She was 44 years old, had 10 years of education and was not currently employed.   AR 9.

She had been employed after the amended onset date of June 28, 2008, but only for a

week because "[her] back couldn't tolerate it and [her] legs would hurt."  AR 11.   Before

this onset date, Irizarry's employment included a full-time cashier position at Wal-Mart

for two and a half years.   AR 12.   She had absentee issues at Wal-Mart, missing one day

out of a five-day workweek due to her back and migraine problems.   AR 13.

After the Wal-Mart position, Irizarry worked three months at a Super 8 Motel as a

housekeeper, which included physical tasks such as making beds and cleaning motel

rooms.   AR11-12.   Irizarry worked two or three hours at a time depending on how many

rooms needed to be cleaned.   AR 13.   Irizarry had to leave that job because "[she]

couldn't tolerate the back [pain] and then was getting migraines."   AR 12.

Irizarry was in a car accident in 2001 and suffered a severe compression fracture to

her mid-back.   AR 13.   In the years after the accident, she experienced "shooting pains

and stab[s]" in her back and "pain and shooting" that radiated down her "legs from the

hips...numbing and tingling."   AR 14.   Irizarry uses a cane prescribed by Dr. Leek, her

current pain doctor.   AR 14.   Irizarry received injections from Dr. Leek for her back, as

well as injections and radio frequency ablation from Dr. Ellias, her previous pain doctor.

AR 15.

Irizarry also testified that she had suffered from migraines for a couple of years and

takes medication every day to prevent headaches, as well as another medication when she

feels a migraine coming on.   AR 16.   She denies any improvement since taking the

migraine prevention medicine.   AR 17.   Additionally, the medication that Dr. Szmanda prescribed has not provided significant relief of the pain and she still gets three headaches per week.   AR 17.   Irizarry has been to the emergency room six times since June 2008 seeking pain relief for her migraines.   AR 17.

## 2. Medical Expert Testimony

The administrative law judge called Dr. Samuel Landau to testify as an impartial medical expert.   Dr. Landau reviewed the evidence and Irizarry's medical records, but did not physically examine Irizarry.   AR 19.

Dr. Landau diagnosed Irizarry as obese with "a heal fresh fracture of vertebrae and degenerative disease of the lumbar spine, excessive with her age."   AR 19.   Landau found that Irizarry's x-ray of her lumbar spine from October 2007 was "unremarkable," noting that the fracture and scar were "minimal."   AR 19.   When asked what it means to have "positive Waddell signs," Dr. Landau responded that they "are non stimulogic responses testing."   AR 20.   Although the rest of his response was inaudible, Landau added that these signs are not 100 percent effective and are not definitive.   AR 20.   Landau also found no evidence in the record that a cane was prescribed to Irizarry, but acknowledged evidence that she was indeed using a cane.   AR 22.   In the end, Dr. Landau found that "there's no significant, objective evidence" to explain her "low back pain" or her claimed inability to complete an eight hour day and sustain a forty hour work week.   AR 21.

Dr.  Landau  also  examined  neurology  records  concerning  Irizarry's  headache

symptoms in September 2008, noting that Irizarry fulfilled the International Headaches Society criteria for the diagnosis of migraines.   AR 19-20.   Landau pointed out, however, that other examiners in the record described Irizarry's symptoms differently than Irizarry's neurologist had described them in September 2008.  AR 19-20.   When asked whether Irizarry's complaints were consistent with objective medical evidence, Dr. Landau replied,

> there's no underlying pathology in there causing headaches but you, you wouldn't expect to find any with migraine headaches.   There's no specific pathology you have to seek.   The diagnosis is based on symptoms based on the kind of symptoms that she has so the diagnosis of getting headaches is not a criteria, a symptomatic criteria expect she has these headaches with pulsating headaches with or without (INAUDIBLE), nausea, vomiting, they have specific criteria.   And according to her doctors, there's enough of that criteria to make that diagnosis.

AR 21-22.

Dr. Landau testified that Irizarry's various impairments, either individually or in combination, should be considered under Social Security listing 1.04.[4]  AR 20.   Dr. Landau also testified that Irizarry would be limited in a work setting.   AR 21. Specifically, standing and walking would be limited to two hours out of an eight-hour day; no limitations as to sitting with normal breaks every two hours; and lifting would be limited to ten pounds frequently and twenty pounds occasionally.   AR 21.   Dr. Landau asserted that to be able to assign additional physical limitations would depend on the reason that Irizarry was prescribed the cane.   AR 23.

---

4   Social security impairment listing 1.04 reads in part, "*Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture). Resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With (A) Evidence of nerve root compression...or, (B) Spinal arachnoiditis...or, (C) Lumbar spinal stenosis..." 20 CFR Part 404, Subpart P, Appendix 1, 1.04.

### 3. Vocational Expert Testimony

Vocational Consultant Kelly Winn testified at the hearing on behalf of the Social Security Commissioner that according to Dr. Landau's assessment of Irizarry's physical limitations, Irizarry would be unable to complete her past work as a cashier or housekeeper.   AR 25-26.   According to Dr. Landau's assessment of Irizarry's limitations, Winn did opine that there would be sedentary, unskilled work available for Irizarry.   AR 26.   Specifically, two examples of possible work would be (1) a telephone information clerk, for whom there are 26,000 jobs in Wisconsin and 420,000 in the national market; and (2) a charge account clerk for which there are 3,800 jobs available in Wisconsin and 490,000 nationally.   AR 26.

Additionally, Ms. Winn testified that these jobs would still be available to Irizarry if she required the use of a cane.   AR 26.   Assuming the ultimate findings of Dr. Landau -- that Irizarry required a cane for stability and would miss one workday out of every five due to migraines -- Ms. Winn testified that there would be *no* work for Irizarry.   AR 27.

### D. Administrative Law Judge's Decision

In finding that Irizarry was not disabled, the administrative law judge, Sharon Turner, applied a standard, five-step sequential evaluation process. *See* 20 CFR 404.1520(a) and 416.20(a).   At step one, the administrative law judge determined that Irizarry had not engaged in substantial gainful activity since June 28, 2008.   AR 37.

At step two, she found that Irizarry had the following severe impairments: obesity;

healed crush fracture of T12; degenerative disc disease of the lumbar spine consistent with age; and migraine headaches.  AR 37.  The administrative law judge determined that Irizarry's diagnosed depressive disorder did not qualify as severe.  AR 37-38.  The judge assessed the four functional areas of the "paragraph B" criteria and found that Irizarry had no more than *mild* limitation in the functional areas of (1) daily living; (2) social functioning; and (3) concentration, persistence or pace and (4) no episodes of decompensation.  To support these findings, the administrative law judge considered Irizarry's report to Dr. Elmergreen that she was able to cook, clean and keep appointments independently.  AR 38.  Additionally, the judge noted that despite Dr. Elmergreen's opinion that Irizarry had moderate difficulty in reading and math and that Irizarry had not graduated high school, Dr. Szmanda, Irizarry's treating neurologist, noted Irizarry had an excellent fund of knowledge and normal memory, insight and judgment.  AR 38.  Finally, the judge found no evidence that Irizarry had episodes of decompensation that have been of extended duration, the fourth functional area.  AR 38-39.

At step three, the administrative law judge determined that Irizarry's impairments, individually or in combination, did not meet or equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. *See* 20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925, and 416.926.  Although acknowledging that Irizarry did suffer from an impairment of the lumbar spine, the administrative law judge determined that this impairment did not satisfy the requirements in severity or duration for social security

impairment listing 1.04, because there was no medical evidence of nerve root or spinal cord compromise.   AR 39.

Next, the administrative law judge found that Irizarry had the residual functional capacity (RFC) to perform sedentary work in accordance with 20 CFR 404.1567(a) and 416.967(a):   Irizarry was able to sit with normal breaks; stand and walk two hours out of eight; and lift and carry 10 pounds frequently, 20 pounds occasionally.   AR 39.   The administrative law judge gave the most weight to the opinions of medical expert, Dr. Landau, in determining Irizarry's residual functional capacity.   AR 40.   Furthermore, the administrative law judge found that Irizarry's impairments of back problems, migraine headaches and left ankle problems could reasonably be expected to cause some of her reported symptoms.   AR 40.   However, the judge found that her statements concerning the intensity, persistence, and limiting effects of the impairments were not fully credible "to the extent they [were] inconsistent with the above residual functional capacity assessment." AR 40.

The judge also determined that Irizarry's statements were inconsistent with objective medical evidence.   Specifically, Irizarry asserted that she was prescribed a cane, but there was no medical evidence of the prescription.   AR 41.   Additionally, in her determination that Irizarry's statements lacked credibility, the judge considered the notation by a Dr. Ellias of positive Waddell signs and of the possibility that Irizarry was not taking prescribed medications.   AR 41.

At step four, the administrative law judge found that Irizarry was incapable of

performing past relevant work.   AR 42.   The judge concluded that the exertion level required of Irizarry's past positions as cashier (unskilled, light exertion level) and cleaner (unskilled, heavy exertion level) exceeded the exertion threshold of a sedentary position. AR 42.

At step five, the administrative law judge relied on testimony from the vocational expert that given Irizarry's age, education, work experience and residual functional capacity, Irizarry would be able to perform such jobs as telephone information clerk (26,000 jobs in Wisconsin), and charge account clerk (3,800 jobs in Wisconsin).   AR 43.  Accordingly, the administrative law judge found Irizarry not disabled.   AR 43.


## OPINION

### A.   Standard of Review

The standard by which a federal court reviews a final decision by the commissioner is well settled:   the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."   42 U.S.C. § 405(g).   Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   The decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).   When the administrative law judge denies benefits, she must build a logical and accurate bridge from the evidence to her conclusion.   *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

B.   Residual Functional Capacity

In  determining  Irizarry's  residual  functional  capacity,  Irizarry  argues  that  the administrative  law  judge  failed  to  properly  consider  and  evaluate  Irizarry's  migraine headaches and her limitations in concentration, persistence and pace.   Based on a review of the record, this court agrees.

The  administrative  law  judge  must  determine  a  claimant's  "residual  functional capacity"  (RFC),  defined  as  "an  assessment  of  an  individual's  ability  to  do  sustained, work-related physical and mental activities in a work setting on a regular and continuing basis."  S.S.R. 96-8.   The  assessment  is  based  on  all  relevant  medical  and  non-medical evidence,  including  statements  from  medical  sources  and  the  claimant  about  how  her physical  or  mental  impairment  limits  her  ability  to  do  basic  work  activities.   20  C.F.R. §404.1545(a)(3).   The adjudicator must consider all of an individual's impairments even if  at  step  two,  the  impairments  were  found  to  not  be  "severe".   S.S.R.  96-8p.   *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir. 2009).

The administrative law judge determined that Irizarry's residual functional capacity included: sitting unlimitedly with normal breaks; standing and walking two hours out of eight;  and  lifting  and  carrying  10  pounds  frequently,  20  pounds  occasionally.   The administrative  law  judge  failed  (1)  to  make  *any*  determination  as  to  the  extent  Irizarry's migraine  headaches  impaired  her  ability  to  work,  and  (2)  to  resolve  apparent,  inconsistent evidence that Irizarry had more than mild limitations in concentration, persistence and pace.

1.  Migraine Headaches

There are substantial contemporary, clinical records and other evidence of record that Irizarry suffered from debilitating migraine headaches, including the administrative law judge's declaration that migraines were a "severe impairment." Despite this, the administrative law judge did not include any limitations associated with Irizarry's headaches in assessing her residual functional capacity.  While the administrative law judge did assess how Irizarry's lumbar spine impairment affected her normal workday, the judge failed to make any finding about how much Irizarry's migraines affected her ability to work, merely concluding "[t]he headaches would cause some inability to perform exertional activities only when she was symptomatic." AR 41.   Specifically, the administrative law judge failed to answer at least two, material questions: (1) to what extent Irizarry's migraines were symptomatic; and (2) to what extent "some inability" precluded Irizarry from performing exertional activities or otherwise limited her work opportunities.

This failure is all the more glaring given the undisputed testimony that the extent of Irizarry's migraines were likely to materially impact her ability to do any kind of work. The medical expert, Dr. Landau, who testified at the hearing, affirmed Irizarry's treating physician's diagnosis of migraines.   AR 22.   Additionally, Irizarry testified that she suffered three headaches per week, the severity of which is confirmed by the many trips to the emergency room, follow up evaluations and ongoing treatment for severe migraines. AR 17.  Finally, the vocational expert testified that missing one day of work out of five

would result in no work opportunities for Irizarry in the national market.   AR 27.

By apparently ignoring the extent to which Irizarry's migraines affected her work capability during a full 40-hour week, the administrative law judge did not adequately assess Irizarry's residual functional capacity, nor allow for an informed assessment of her work opportunities.   *Zurawski*, 245 F.3d at888-889; *Briscoe v. Barnhart,* 425 F.3d 345, 352 (7th Cir. 2005).   Therefore, the court is remanding this case to the commissioner to determine to what extent Irizarry's migraines affected her ability to work.

2.   Mental Impairment Evaluation regarding Concentration, Persistence, and Pace

In determining that Irizarry's depression was not a severe impairment, the administrative law judge found Irizarry had only mild limitations in maintaining concentration, persistence or pace.   The administrative law judge relied on Dr. Szmanda's opinion that Irizarry's memory, insight and judgment were normal and that she had an excellent fund of general knowledge.   The judge is certainly entitled to rely on a treating physician's opinion if it is well supported and no evidence exists to contradict it.   C.F.R. § 404.1527(d)(2).   *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).   If the record contains well-supported contradictory evidence, however, the administrative law judge is obligated to consider other factors before giving weight to the treating physician's opinion. These factors include: the number of times the treating physician has examined the claimant; whether the physician is a specialist as to the subject impairment; how consistent the physician's opinion is with the evidence as a whole; and other factors.

C.F.R. § 404.1527(d)(2).

In this case, there is significant evidence that contradicts Szmanda's opinion.  Dr. Elmergreen, the consultative examiner, found that Irizarry had moderate difficulty in occupational functioning and that her intellectual functioning was "well below average." State agency psychologist, Roger Rattan, found Irizarry moderately limited in maintaining concentration, persistence and pace.  The administrative law judge should have better articulated why she relied on Szmanda's opinion despite this other evidence of record before finding Irizarry had only mild limitations of maintaining concentration, persistence or pace.

Even if, after assessing the factors required by C.F.R. § 404.1527(d)(2), the administrative law judge were to conclude that Irizarry has only mild limitations in concentration, persistence and pace, she was still required to consider Irizarry's mental impairment of depression (even though she did not find it to be severe) in her determination of residual functional capacity.  On remand, the commissioner should determine whether Irizarry's depression affects her ability to work.

### 3.  Assessment of Credibility

Irizarry also argues that the administrative law judge erred in finding Irizarry's testimony not credible.  In support of her finding, the judge pointed to Irizarry's testimony that she was prescribed a cane, when she was not.  The judge's statement is not supported by the evidence of record, which shows that Dr. Leek prescribed a cane for

Irizarry in March 2009.  AR 588.  Were the administrative law judge to have considered this evidence, her credibility determination might have been different.  On remand, the commissioner should reassess Irizarry's credibility after assessing the evidence of Dr. Leek's cane prescription, the medical evidence of migraine headaches and of Irizarry's limitations in concentration, persistence, and pace.

ORDER

IT IS ORDERED that plaintiff Roberta Jean Irizarry's motion for summary judgment (dkt. #10) is GRANTED. The decision of defendant Michael J. Astrue, Commissioner of Social Security, denying plaintiff Roberta Jean Irizarry's application for disability insurance benefits is REVERSED and the case is REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Entered this 15th day of August, 2013.

BY THE COURT:

/s/
_____
WILLIAM M. CONLEY
District Judge